**WOLLMUTH MAHER & DEUTSCH LLP**
Paul R. DeFilippo
James N. Lawlor
Joseph F. Pacelli (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

*Counsel for the Cross-Holder Ad Hoc Group*

**JONES DAY**
Bruce Bennett (admitted *pro hac vice*)
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

-and-

Benjamin Rosenblum (admitted *pro hac vice*)
Genna L. Ghaul
Andrew Butler (admitted *pro hac vice*)
Benjamin C. Sandberg (admitted *pro hac vice*)
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-8312
Facsimile: (212) 755-7306
brosenblum@jonesday.com
gghaul@jonesday.com
abutler@jonesday.com
bsandberg@jonesday.com

*Counsel for the Cross-Holder Ad Hoc Group*

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY**

| | |
|---|---|
| In re:<br><br>MULTI-COLOR CORPORATION, *et al.*,<br><br>Debtors.[1] | Chapter 11<br><br>Case No.: 26-10910 (MBK)<br><br>Judge: Michael B. Kaplan |
| BTG Pactual Asset Management US, LLC, BTG Pactual Absolute Return Master Fund, L.P., Canyon Capital Advisors LLC, The Canyon Value Realization Master Fund, L.P., River Canyon Fund Management LLC, River Canyon Total Return Bond Fund, Owl Creek Asset Management, L.P., Owl Creek Credit Opportunities Master Fund, L.P., Shenkman Opportunistic Credit Master Fund LP, Third Point LLC, and Third Point Master Fund LP<br><br>Plaintiffs<br><br>v.<br><br>Barclays Bank PLC<br><br>Defendant. | Adv. Pro. No.: 26-01041 (MBK) |

**PLAINTIFFS' OPPOSITION TO DEFENDANT BARCLAYS BANK PLC'S MOTION
TO STAY, ABSTAIN, OR DISMISS THE ADVERSARY PROCEEDING**

Plaintiffs BTG Pactual Asset Management US, LLC; BTG Pactual Absolute Return Master

Fund, L.P.; Canyon Capital Advisors LLC; The Canyon Value Realization Master Fund, L.P.;

River Canyon Fund Management LLC; River Canyon Total Return Bond Fund; Owl Creek Asset

Management, L.P.; Owl Creek Credit Opportunities Master Fund, L.P.; and Shenkman

Opportunistic Credit Master Fund LP (collectively, the "Cross-Holder Ad Hoc Group" or

---

[1] The last four digits of Debtor Multi-Color Corporation's tax identification number are 5853. A complete list of each of the Debtors in these chapter 11 cases may be obtained on the website of the Debtors' claims and noticing agent at https://veritaglobal.net/MCC. The location of the Debtors' service address for purposes of these chapter 11 cases is: 3284 Northside Parkway NW, Suite 400, Atlanta, Georgia 30327.

"Plaintiffs"), [2] by and through undersigned counsel, respectfully submit this Opposition to (i) Defendant Barclays Bank PLC's ("Barclays") *Motion Under Federal Rules of Bankruptcy Procedure 7012(b)(1) and 7012(b)(6) to Stay, Abstain, or Dismiss the Adversary Proceeding* [Adv. Proc. Dkt. 16] (the "Motion to Dismiss"); (ii) the Secured Ad Hoc Group's (the "Secured Ad Hoc Group") *Joinder to Barclays' Motion to Stay, Abstain, or Dismiss the Adversary Proceeding* [Adv. Proc. Dkt. No. 35] (the "SAHG Joinder"); and (iii) Arawak XI, L.P.'s ("Arawak" and together with the Secured Ad Hoc Group, the "Secured Lenders") *Joinder to Barclays Bank PLC's Motion to Stay or Dismiss This Adversary Proceeding* [Adv. Proc. Dkt. No. 36] (the "Arawak Joinder" and together with the SAHG Joinder, the "Joinders").  The Cross-Holder Ad Hoc Group maintains its objection that venue is improper in this Court for the reasons set forth in its *Motion to Dismiss or, in the Alternative, Transfer the Chapter 11 Cases* [Case No. 26-10910 (the "Main Case"), Dkt. No. 71].

## PRELIMINARY STATEMENT

1.      Barclays and the Secured Lenders ask this Court to either delay or dismiss outright the Cross-Holder Ad Hoc Group's request for declaratory relief concerning the scope and value of Barclays's liens.  The Motion to Dismiss and Joinders fundamentally recharacterize settled bankruptcy law and the Cross-Holder Ad Hoc Group's requests for declaratory relief.  Under binding Supreme Court and Third Circuit precedent, the Cross-Holder Ad Hoc Group—as creditors with pecuniary interests directly affected by the extent and value of Barclays's liens— have independent standing to seek declaratory relief under sections 502 and 506 of title 11 of the United States Code (the "Bankruptcy Code").  11 U.S.C. §§ 502, 506.  The Cross-Holder Ad Hoc

---

[2] Capitalized terms used but not otherwise defined herein have the meanings ascribed to such terms in the Complaint filed in the above captioned adversary proceeding (the "Adversary Proceeding").

3

Group is not asserting derivative claims belonging to the Debtors' estates; they are exercising their statutory rights as parties in interest to challenge the claims of other creditors. Barclays and Arawak attempt to recharacterize the Cross-Holder Ad Hoc Group's requests for declaratory relief as "generalized estate claims" requiring derivative standing under *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) and *In re Emoral, Inc.*, 740 F.3d 875 (3d Cir. 2014). This is baseless, would work a fundamental shift in established bankruptcy law, and ignores the critical distinction between estate claims against third parties and creditor objections to the claims of other creditors. The Unsecured Notes (as defined below)— *i.e.*, the basis for the Cross-Holder Ad Hoc Group's claims—are the only claims to lose out in the deal embodied in the Plan; all other unsecured creditors will remain unimpaired. As such, Barclays's and the Secured Lenders' arguments constitute nothing more than a transparent attempt to delay the resolution of critical threshold issues that must be determined before this Court can properly evaluate or confirm any plan of reorganization.

2. Barclays's and the Secured Lenders' request for a stay is equally meritless. The issues raised in this Adversary Proceeding—particularly the scope of the collateral package and the identification of unencumbered assets—are distinct from the valuation determinations that will occur at confirmation. Resolving these threshold questions now will streamline the confirmation process, not duplicate it. This Court cannot properly assess the treatment of secured and unsecured funded debt claims under any proposed plan without first determining the scope of Barclays' liens and the value of the collateral securing them. Indeed, these issues raised in the Complaint are precisely the types of matters that adversary proceedings are designed to and must resolve. *See* Fed. R. Bankr. P. 7001(b). The Cross-Holder Ad Hoc Group would be prejudiced by a stay because sprinting to confirmation without determining the scope, extent, and value of Barclays'

4

liens would permit consideration of a plan which is based on inaccurate assessments of the actual secured status of secured creditors (which are included in the Disclosure Statement) without a sufficient record.

3.      The issues raised in the Complaint—the true nature and scope of Barclays' liens—are the difference between enormous value that rightfully belongs to unsecured noteholders and radically unequal treatment between creditors in the same class.  Therefore, determining the extent of these liens and the value of the collateral is essential not only to this Adversary Proceeding but to the fairness of these bankruptcy cases as a whole.

4.      Barclays' claims of judicial efficiency are without merit.  Staying the decision of a necessary issue is the opposite of efficient.  Moreover, fundamental fairness and upholding the integrity of the Bankruptcy Code cannot yield to Barclays' views of judicial efficiency.  The record demonstrates that these bankruptcy cases have been orchestrated from inception by the Debtors' controlling shareholder, Clayton, Dubilier & Rice, LLC (the "Sponsor") and the Secured Ad Hoc Group (who are both substantially undersecured) to enrich themselves at the expense of unsecured noteholders, including the Cross-Holder Ad Hoc Group.  As such, Barclays' and the Secured Lenders' appeal to judicial economy and efficiency rings hollow and is being leveraged to streamline an unlawful process unchecked.  Judicial economy cannot be weaponized to vitiate the protections under the Bankruptcy Code and the statutory and procedural rights to which the Cross-Holder Ad Hoc Group is entitled.  Indeed, Barclays and the Secured Lenders misrepresent the extent of their liens to do the very thing they argue the Cross-Holder Ad Hoc Group is not permitted to do:  "expand[] the pool of []encumbered assets available for distribution" to the Secured Lenders.  Mot. ¶ 10.

5. The Secured Lenders, through their agent Barclays, attempt to cut off any effort by the Cross-Holder Ad Hoc Group to ensure justice and fairness. They seek to weaponize every aspect of the Bankruptcy Code and Bankruptcy Rules to protect and fast-track a restructuring orchestrated by the Sponsor and Secured Ad Hoc Group for the purpose of stealing value from unsecured noteholders and coming out on the other end with majority ownership of the reorganized debtors at a steep discount. This Adversary Proceeding is an essential step to prevent that abuse.

## FACTUAL BACKGROUND

6. On January 29, 2026 (the "Petition Date"), Multi-Color Corporation and its affiliated debtors (the "Debtors") commenced voluntary cases under chapter 11 of the Bankruptcy Code. As of the Petition Date, the Debtors had approximately $5.9 billion in aggregate outstanding principal debt. *Declaration of Garrett Gabel, Chief Restructuring Officer of Multi-Color Corporation and Certain of its Affiliates, in Support of the Debtors' Chapter 11 Petitions and First Day Pleadings* [Main Case, Dkt. No. 23, ¶ 39]. On the same day, the Debtors filed the *Disclosure Statement Relating to the Joint Prepackaged Plan of Reorganization of Multi-Color Corporation and Its Debtor Affiliates Pursuant to Chapter 11 of the Bankruptcy Code* [Main Case, Dkt. No. 18] (the "Disclosure Statement"), which states that Barclays holds liens on "substantially all the assets and property" of the Debtors on behalf of the Secured Lenders. Disclosure Statement, at 32.

7. At the initial first day hearing held on January 30, 2026 (the "First Day Hearing"), Brent Banks, Senior Managing Director of Evercore and the Debtors' investment banker, admitted under oath that there are substantial categories of the Debtors' assets that are not subject to the Secured Lenders' liens, *see* Final DIP Objection ¶¶ 96, 138—a critical admission that directly

contradicts the Debtors' representations that the non-ABL secured lenders have a lien on "substantially all the assets." Disclosure Statement, at 32.

8.      On February 2, 2026, the Court entered the Interim DIP Order authorizing the Debtors to obtain postpetition financing and use cash collateral. [Main Case, Dkt. No. 106]. The Interim DIP Order contains stipulations concerning the validity, priority, and extent of Barclays' liens. *Id.* at 17. The Interim DIP Order also establishes a defined Challenge Period during which parties in interest may challenge those liens. *Id.* at ¶ 21.

9.      On February 14, 2026, within the Challenge Period, the Cross-Holder Ad Hoc Group timely filed the Complaint against Barclays seeking declaratory relief concerning two discrete issues: (i) the scope of Barclays' liens under the Term Loan Security Agreement, and (ii) the fair market value of the collateral securing the secured claims and the value of the Debtors' unencumbered assets. Compl. ¶¶ 39-54.

10.     On February 23 and February 26, 2026, respectively, the Secured Ad Hoc Group and Arawak filed motions to intervene in this Adversary Proceeding (the "Intervention Motions"). Adv. Proc. Dkt. Nos. 5, 11.

11.     On March 2, 2026, Barclays filed the Motion to Dismiss. Adv. Proc. Dkt. No. 16.

12.     On March 9 and March 10, 2026, respectively, the Court granted the Intervention Motions but required the Secured Lenders to each "file a motion for stay or in the alternative a motion to dismiss the Adversary Proceeding, other responsive pleading to the Complaint, or joinder to the pending [Motion to Dismiss]." Adv. Proc. Dkt. Nos. 33, 34. On March 10, 2026, the Secured Lenders filed their respective Joinders. Adv. Proc. Dkt. Nos. 35, 36.

13.     The Cross-Holder Ad Hoc Group members hold beneficial interests in the 2027 Unsecured Notes and the 2029 Unsecured Notes (collectively, the "Unsecured Notes") and are

7

unsecured creditors of the Debtors' estates.  Compl. ¶ 2.  As unsecured creditors, the Cross-Holder Ad Hoc Group have a direct pecuniary interest in the extent of Barclays' liens and the proper identification and valuation of both encumbered and unencumbered assets.

## ARGUMENT

I. **THE CROSS-HOLDER AD HOC GROUP HAS STANDING TO SEEK DECLARATORY RELIEF UNDER §§ 502 AND 506 OF THE BANKRUPTCY CODE**

A. **Creditors Are Parties In Interest With Standing To Object To Claims And Challenge Liens Under The Bankruptcy Code**

14. Barclays' and the Secured Lenders' standing argument—that the Cross-Holder Group lacks standing by asserting generalized claims belonging to the estate, Mot. ¶¶ 33-51; Arawak Joinder ¶¶15-20—fundamentally mischaracterizes the Complaint and bankruptcy law. The Cross-Holder Ad Hoc Group's Complaint does not assert "estate claims" requiring derivative standing under *Cybergenics*, 330 F.3d 548; rather, the Cross-Holder Ad Hoc Group is exercising its statutory right as a party in interest to object to and seek modification of other creditors' secured claim under sections 502(a) and 506(a) of the Bankruptcy Code.

15. The Supreme Court recently reaffirmed the broad scope of "party in interest" standing in *Truck Insurance Exchange v. Kaiser Gypsum Co.*, 602 U.S. 268 (2024).  In that case, the Court held that "an insurer with financial responsibility for bankruptcy claims is a 'party in interest' under § 1109(b) that may 'appear and be heard on any issue' in a Chapter 11 proceeding." *Id.* at 278.  The Court explained that "[t]he plain meaning of the phrase [party in interest] thus refers to entities that are potentially concerned with or affected by a proceeding." *Id.* (citations and quotation omitted).  The Court further observed that Congress uses the phrase "party in interest" in bankruptcy provisions when it intends the provision to apply "broadly." *Id.* at 269.

16.     This understanding applies with equal force to creditors seeking to challenge the claims and liens of other creditors.  The clear and unambiguous language of section 502(a) of the Bankruptcy Code "authorizes a party in interest to object to any claim or interest, proof of which is filed under section 501 of the Code.  Nowhere is this right made subject to any other provision of the Code or to the trustee's refusal to pursue possible objections to certain claims."  *In re Mechanicsburg Fitness, Inc.*, 592 B.R. 798, 807 (Bankr. M.D. Pa. 2018).  "Additionally, there is no language requiring a party in interest to seek leave of court before pursuing such an objection."  *Id.*

17.     Similarly, courts have consistently found that parties in interest have standing to seek modification of another creditor's claim pursuant to section 506(a) of the Bankruptcy Code.  *In re Weinstein Co. Holdings, LLC*, 595 B.R. 455, 463 (Bankr. D. Del. 2018) (collecting cases).

18.     Accordingly, the Cross-Holder Ad Hoc Group is a "party in interest" and has standing to assert its rights as a creditor under sections 502 and 506 of the Bankruptcy Code, as well as Bankruptcy Rule 7001.

### B.     The Cross-Holder Ad Hoc Group's Claims Are Not Estate Claims Requiring Derivative Standing

19.     Barclays' and Arawak's reliance on *Cybergenics* and *Emoral* to argue the Cross-Holder Ad Hoc Group must first seek derivative standing is fundamentally misplaced.  Each of those cases and their progeny address a category of claims entirely different from the declaratory relief sought in this Adversary Proceeding—they involved estate claims against third parties for wrongdoing that harmed all creditors equally and, if successful, would bring assets into the estate.  The declaratory relief sought in the Complaint does not seek to hold a party liable, pursue claims belonging to the estate or recover assets to enlarge the estate; it seeks declaratory relief concerning

the scope and value of Barclays' liens.  This is the quintessential creditor-versus-creditor dispute that the Bankruptcy Code expressly authorizes individual creditors to bring.

20.     Indeed, Barclays and the Secured Lenders fail to cite **one** case under *Emoral*, *Cybergenics* or their progeny that supports their position that an action to determine the validity, extent, or value of a lien is a derivative claim belonging to the debtor's estate.  *See Emoral*, 740 F.3d at 879–81  (successor liability claim); *Cybergenics*, 330 F.3d at 553–54 (en banc) (fraudulent transfer claims arising from leveraged buyout); *In re Wilton Armetale, Inc.*, 968 F.3d 273, 282–83 (3d Cir. 2020) (fraudulent transfer and breach of fiduciary duty claims); *St. Paul Fire & Marine Ins. Co. v. PepsiCo, Inc.*, 884 F.2d 688, 701 (2d Cir. 1989) (fraudulent transfer, preference, and alter ego claims); *In re Commodore Int'l Ltd.*, 262 F.3d 96, 100 (2d Cir. 2001) (avoidance claims); *In re G-I Holdings, Inc.*, 313 B.R. 612, 627–28 (Bankr. D.N.J. 2004) (fraudulent transfer claims under § 544(b)); *In re National Forge Co.*, 326 B.R. 532, 542–43 (W.D. Pa. 2005) (fraudulent transfer and breach of fiduciary duty claims); *In re Mee Apparel, LLC*, No. 15-5697, 2016 WL 3535805, at *3 (D.N.J. June 28, 2016) (alter ego claims); *In re One2One Commc'ns, LLC*, No. 12-27311, 2014 WL 3882467, at *4 (Bankr. D.N.J. Aug. 7, 2014) (avoidance actions); *In re Guardian Elder Care at Johnstown, LLC*, 666 B.R. 651, 657–58 (Bankr. W.D. Pa. 2025) (novel theory of reducing value of secured creditor's collateral by "any intangible and undefined 'Bankruptcy-Created Enhancements to Value.'"); *In re WorldSpace, Inc.*, No. 08-12412, 2016 WL 5339056, at *6 (D. Del. Sept. 22, 2016) (breach of fiduciary duty claims); *In re Whittaker, Clark, & Daniels*, 663 B.R. 1, 12 (Bankr. D.N.J. 2024), *aff'd*, 152 F.4th 432 (3d Cir. 2025) (successor liability claims); *In re Our Alchemy, LLC*, No. 17-10454, 2017 WL 3037445, at *5 (Bankr. D. Del. July 17, 2017) (breach of fiduciary duty claims against chapter 7 trustee); *In re PHP Healthcare Corp.*, 128 F. App'x 839, 841 (3d Cir. 2005) (per curiam) (unlawful stock redemption).

21.      Even applying the *Emoral* framework, the relief sought in this Adversary Proceeding is distinguishable because it seeks to rectify a "particularized injury" specific to the Cross-Holder Ad Hoc Group.  Courts distinguish between "general" claims belonging to the estate and "particularized" or "personal" claims that a creditor may pursue independently.  *Emoral*, 740 F.3d at 879, 881.  As set forth in the Disclosure Statement, Class 4 First Lien Secured Claims (of which the Secured Lenders' claims are a part) are expected to recover between 81.6-98.4% and Class 5 Junior Funded Debt Claims (of which the Cross-Holder Ad Hoc Group's claims are a part) are expected to recover between 2.6-2.8%.  Disclosure Statement at 11-12.  Class 6 General Unsecured Claims are unimpaired.  *Id.* at 13.  If the Court declared that Barclays' liens were less than they are purported to be in the Disclosure Statement and Plan, such a ruling would increase Class 5 recoveries (including for the Cross-Holder Ad Hoc Group) but would have no impact on the recovery of Class 6 General Unsecured Creditors.  As such, the claims brought in the Complaint are not "generalized claims" and do not "increase the pool of assets available to all creditors"; they are claims seeking to remedy a "particularized injury" inflicted upon Class 5 claimants, with the Cross-Holder Ad Hoc Group standing the most to lose (or gain).  *Emoral*, 740 F.3d at 879, 881 (citations and quotations omitted).

22.      The decision in *In re Weinstein Co.* is directly on point.  595 B.R. 455 (Bankr. D. Del. 2018).  There, the bankruptcy court held that a creditor had standing under the Bankruptcy Code to assert claims under sections 502 and 506 of the Bankruptcy Code contesting the validity and extent of another creditor's claims and liens because the plaintiff was a creditor.  *Id.* at 462-64.  The court rejected the defendant's argument that the plaintiff needed derivative standing, holding that "[s]ection 1109(b) expressly provides that a creditor is a party in interest with the right to 'raise and . . . be heard on any issue in a case under' chapter 11." *Id.* at 463.  The court further

found that "Section 502(a) also states that a 'claim or interest . . . is deemed allowed, unless a party in interest . . . objects.'" *Id.* (quoting 11 U.S.C. § 502(a)).

23.     The *Weinstein* court also rejected the argument that the plaintiff's claims were too generalized to confer standing.  The court found that "the Plaintiff has standing under the Bankruptcy Code to assert claims under sections 502 and 506 contesting the validity of the Defendants' claims and liens." *Id.* at 462-64.  Importantly, the court concluded that because the plaintiff had standing under the Bankruptcy Code to object to the defendants' claims, it met the requirements for Article III standing as well. *Id.* at 464-65.

24.     The same analysis applies here.  It is undisputed that the Cross-Holder Ad Hoc Group members are creditors of the Debtors' estates.  As creditors, they are parties in interest with standing to object to Barclays' and the Secured Lenders' claims and challenge the extent of their security interest under sections 502 and 506.  Further, a declaratory judgment action to determine the extent of their liens is a procedural mechanism available to the members of the Cross-Holder Ad Hoc Group as parties in interest.

25.     Barclays' and the Secured Lenders' attempt to curtail the Cross-Holder Ad Hoc Group's statutory rights to seek a declaratory judgment by arguing that it seeks to assert estate claims rings particularly hollow.  The Unsecured Notes—*i.e.*, the Cross-Holders Ad Hoc Group's claims—are the ***only*** claims to lose out in the deal embodied in the Plan; and, to be clear, they lose substantially.  All other general unsecured claims ride through completely unimpaired.  Plan Art. III.B.6.  This is purely a matter of allocation, further demonstrating that the these are not general estate claims at issue.  Declaratory judgments in favor of the Cross-Holder Ad Hoc Group on the issues stated in the Complaint will not enlarge the estate for the benefit of all unsecured creditors.  Rather, it will result in the proper allocation of finite, predetermined estate assets.

12

**C.    The Cross-Holder Ad Hoc Group Has A Direct Pecuniary Interest That Satisfies Standing Requirements**

26.    A creditor's interest in a bankruptcy case is pecuniary, and a creditor is therefore a party in interest with standing to object to the claims of other creditors.  "Everyone with a claim to the res [the debtor's assets] has a right to be heard before the res is disposed of. . . . Indeed, a debtor's creditors 'are the primary parties in interest' in the debtor's case."  *In re C.P. Hall Co.*, 513 B.R. 540, 543 (Bankr. N.D. Ill. 2014) (citations and quotations omitted).

27.    As the court explained in *Mechanicsburg Fitness,* "the legally protected interest of every general unsecured claimant can be affected by the value and viability of every priority and other general unsecured claim"—including, critically, by the extent of secured creditors' liens. 592 B.R. at 805.  "Specifically, as the aggregate value of all allowed priority and general unsecured claims increases, the amount available for distribution to any one of the general unsecured claims decreases."  *Id.* at 805; *see also C.P. Hall Co.*, 513 B.R. at 543 (Bankr. N.D. Ill. 2014) (allowing creditor to object to claim of another creditor because a "creditor's interest in a bankruptcy case is pecuniary, and so a creditor is a 'party in interest' with standing to object to the claims of other creditors" under section 502).  This dynamic naturally operates as an incentive for general unsecured claimants to object to the claims of priority and other secured claimants.

28.    The Cross-Holder Ad Hoc Group's interest here is direct and particularized.  Here, the Cross-Holder Ad Hoc Group members hold a specific type of debt—the Unsecured Notes— and have a direct, personal interest in ensuring that the scope of Barclays' liens is properly determined.  If Barclays' liens do not extend to all of the assets that the Debtors have characterized as encumbered, then there will be a larger pool of unencumbered assets available for distribution to holders of Unsecured Notes, including the Cross-Holder Ad Hoc Group.  Conversely, if Barclays' liens are determined to cover assets that should be unencumbered, the Cross-Holder Ad

13

Hoc Group will receive less in distributions.  This is precisely the type of direct pecuniary injury that confers standing under both the Bankruptcy Code and Article III.  *Weinstein*, 595 B.R. at 462-65.  And this is precisely why the Cross-Holder Ad Hoc Group seeks declaratory relief concerning the scope and value of Barclays' liens—matters that directly affect the Cross-Holder Ad Hoc Group members' rights as creditors.

### D.    The Interim DIP Order Does Not Require The Cross-Holder Ad Hoc Group To Obtain Derivative Standing.

29.    Barclays and Arawak argue that Paragraph 21 of the Interim DIP Order requires the Cross-Holder Ad Hoc Group to first obtain derivative standing from the Court before bringing any challenge.  Mot. ¶¶ 29-30; Arawak Joinder ¶ 17.  This argument misreads the Interim DIP Order.  The provision Barclays and Arawak cite states that nothing in the Interim DIP Order "vests or confers" standing to pursue "claim[s] or cause[s] of action ***belonging to the Debtors or their estates***."  Interim DIP Order ¶ 21 (emphasis added).  As explained above, *supra* ¶¶ 19-25, the declaratory relief sought in the Complaint does not relate to estate claims that, if granted, would enlarge the estate.  Indeed, the Cross-Holder Ad Hoc Group is not relying on the Interim DIP Order as the source of its standing; its standing derives from sections 502 and 506 of the Bankruptcy Code.  This is strictly a creditor-on-creditor dispute.

30.    The *Weinstein* court addressed an identical argument and rejected it.  There, the defendants argued that the plaintiff did not comply with the terms of a final DIP order because it did not seek and obtain an order granting it standing to file its challenge.  595 B.R. at 461-66.  The court disagreed, holding that the final DIP order "did not require an investigation prior to raising an objection" and that sections 502 and 506 of the Bankruptcy Code grant creditors standing.  *Id.* at 462.

14

31.      The Interim DIP Order preserves the ability of parties in interest to bring challenges within the Challenge Period.  It does not preclude the Cross-Holder Ad Hoc Group from asserting its statutory rights vis-à-vis another creditor.  The Cross-Holder Ad Hoc Group filed its Complaint within this period, exercising the very challenge rights that the Interim DIP Order was designed to preserve.  Barclays and the Secured Lenders cannot now argue that the Interim DIP Order bars the Cross-Holder Ad Hoc Group from pursuing those challenges.

## II.      THE COURT SHOULD NOT STAY THIS ADVERSARY PROCEEDING

### A.      Resolution Of Lien Scope and Collateral Valuation Issues Will Streamline, Not Duplicate, The Confirmation Process

32.      Barclays and the Secured Lenders argue that the issues raised in this Adversary Proceeding should be deferred to confirmation.  Mot. ¶¶ 23-31; Arawak Joinder 7-14; SAHG Joinder ¶¶ 5-9.  But determining the threshold question of which assets are and are not encumbered is distinct from the valuation issues that will arise at confirmation.  Resolving lien scope and collateral value now will provide clarity to all stakeholders and streamline the confirmation process by establishing the baseline facts from which valuation and plan treatment can proceed.  Allowing the Adversary Proceeding to continue will also enable the Cross-Holder Ad Hoc Group to pursue the declaratory relief sought in the Complaint in the most efficient manner possible.

33.      As an initial matter, the Cross-Holder Ad Hoc Group filed its complaint within the Challenge Period established by the Interim DIP Order.  Interim DIP Order ¶ 21; Mot. ¶ 18.  Courts have recognized that creditors filing challenges within DIP order challenge periods are acting appropriately to preserve their rights.  In *Weinstein*, the court noted that the Final DIP Order "expressly allowed for a challenge to be raised, and the Plaintiff raised such challenge within the specified time limit."  595 B.R. at 462.  The court found *res judicata* inapplicable because the DIP Order specifically provided for the type of challenge at issue.  *Id.*

34.    Here, the Interim DIP Order contemplates precisely this type of challenge. Barclays and the Secured Lenders cannot now argue that the Cross-Holder Ad Hoc Group should have waited until confirmation when the very order governing the case establishes a window for challenges.  Barclays's and the Secured Lenders' request for a stay is an attempt effectively to nullify these challenge rights by preventing the Cross-Holder Ad Hoc Group from obtaining any judicial resolution until after confirmation.

35.    Barclays' and the Secured Lenders' position that the issues in the Complaint should be reserved for the confirmation hearing to avoid duplicative litigation contravenes controlling law and nullifies Bankruptcy Rule 7001, which expressly requires a lien challenge to be brought via adversary proceeding, not a contested plan confirmation matter.  *In re Mansaray-Ruffin*, 530 F.3d 230, 234 (3d Cir. 2008) (holding that "Federal Rule of Bankruptcy Procedure 7001 sets forth matters that may only be resolved through an 'adversary proceeding,' including the determination of the validity, priority, or extent of a lien or other interest in property" and liens cannot be invalidated through the plan confirmation process without this affirmative procedural step) (internal quotations omitted); *In re Kressler*, 252 B.R. 632, 635 (Bankr. E.D. Pa. 2000) (sustaining objection to plan confirmation where debtor attempted to avoid lien through plan process, holding that "the Rules require a proceeding to determine the extent, validity or priority of a lien be instituted by complaint") (citing Fed. R. Bankr. P. 7001(b)); *Cen-Pen Corp. v. Hanson*, 58 F.3d 89, 93 (4th Cir. 1995) ("If an issue must be raised through an adversary proceeding it is not part of the confirmation process and, unless it is actually litigated, confirmation will not have a preclusive effect.") (citation and quotation omitted); *In re Commercial W. Fin. Corp.*, 761 F.2d 1329, 1338-39 (9th Cir. 1985) (reversing confirmation due to trustee's "improper attempt to circumvent the bankruptcy rules of procedure" by seeking to avoid security interests through plan

16

confirmation rather than initiating adversary proceedings under Bankruptcy Rule 7001); *In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mont. 1987) ("An adversary proceeding under Bankruptcy Rule 7001 must be filed to determine the validity, priority or extent of a lien or other interest in the property. It is not the purpose of a Chapter 11 Plan to be used as a litigating tactic").

36.   Also, contrary to Barclays' and the Secured Lenders' assertions, resolving lien scope and collateral valuation prior to confirmation promotes judicial economy.  The scope of Barclays' liens and the value of the collateral are threshold issues that will necessarily affect every aspect of plan confirmation, including the classification of claims, the treatment of creditors, and whether any plan can satisfy the requirements of 11 U.S.C. § 1129.  And Bankruptcy Rule 7001 mandates that a dispute relating to the "validity, priority, or extent of a lien" must be brought via an adversary proceeding.  Fed. R. Bankr. Proc. 7001(b); *see also Mansaray-Ruffin*, 530 F.3d at 238; *In re Kressler*, 252 B.R. at 635 (sustaining objection to plan confirmation where debtor attempted to avoid lien through plan process, holding that "the Rules require a proceeding to determine the extent, validity or priority of a lien be instituted by complaint") (citing Fed. R. Bankr. P. 7001(b)).  Count I of the Complaint seeks this exact relief.  Compl. ¶¶ 39-45.  Count II of the Complaint seeks a declaratory judgment determining the value of the collateral, the value of the unencumbered assets, and the allowed amount of Barclays' secured claim pursuant to Bankruptcy Rule 3012 and section 506(a).  Compl. ¶¶ 46-54.  While Bankruptcy Rule 7001 excepts disputes under Bankruptcy Rule 3012 from the adversary proceeding mandate, courts have held that such disputes can be properly litigated in either an adversary proceeding or contested matter.  *See In re Taras*, 136 B.R. 941, 950 (Bankr. E.D. Pa. 1992) (overruling "procedural objection" insisting that

Rule 3012 motion should have preceded adversary proceeding).[3]  The Bankruptcy Rule 7001 and 3012 issues here are closely related and critical gating items to confirmation.  Given Bankruptcy Rule 7001's mandate that a dispute regarding the extent of the liens must be litigated in an adversary proceeding, it would not promote judicial efficiency to bifurcate the issues with one (extent of liens) in an adversary proceeding and the other (section 506(a) collateral valuation) in connection with confirmation.  In other words, an adversary proceeding is the ***only*** posture in which ***both*** issues can be litigated simultaneously.  Therefore, allowing the Adversary Proceeding to continue ensures maximum judicial efficiency.  Resolving these issues now—with the benefit of full discovery and a developed evidentiary record—will streamline the confirmation process, not complicate it.

37.      Barclays' reliance on *In re Financial Oversight & Management Bd. for Puerto Rico*, 617 B.R. 397, 413 (D.P.R. 2020) is misguided.  Aside from being a proceeding under PROMESA, not chapter 11, there, a creditor brought an adversary proceeding to ***assert*** its purported liens on assets of the debtor; the court stayed the proceeding stating that it was more prudent and in the interests of judicial economy that such issues relating to collection on a claim to proceed in connection with confirmation and/or the claims objection process.  *Id.*  Unlike *Puerto Rico*, here, the Cross-Holder Group is not seeking to assert liens against the Debtors' property; rather, it challenges a secured creditor group for lien overreach.  This is not a creditor ***against*** debtor issue like in *Puerto Rico*; this is a creditor on creditor issue expressly permitted under sections 502 and 506 of the Bankruptcy Code and Bankruptcy Rule 7001.

---

[3] Though Arawak XI and the Secured Ad Hoc Group quibble with the Cross-Holder Ad Hoc Group seeking relief under Bankruptcy Rule 3012 in this Adversary Proceeding, they do not seek to dismiss or stay the Adversary Proceeding on this basis.  Arawak Joinder ¶ 7, 14; SAHG Joinder ¶ 7.

38.     Other cases relied upon by Barclays and Arawak are similarly distinguishable. In *Northwest Senior Housing*, the debtor itself moved to stay its own adversary proceeding—a lawsuit it had filed to recover monetary damages that was originally intended to fund a reorganization but became ancillary when the case converted to a sale, such that the litigation could simply be assigned to a trustee for post-confirmation resolution without affecting the confirmation process. *In re Northwest Senior Housing Corp.*, No. 22-3040 (Bankr. N.D. Tex. Feb. 2, 2023), ECF No. 300, Hr. Tr. 26:23-27-4 ("[T]he Court cannot ignore the changed circumstances of this particular case. This case was at one time a reorg case, was at one time heavily premised not only on this litigation but on a substantial recovery in this litigation, which would have funded a reorganization. That's not the case anymore. This is now a sale case, with the anticipation of a Litigation Trustee and a Litigation Oversight Committee."). Here, by contrast, this Adversary Proceeding is a critical prerequisite to confirmation: the extent of Barclays' liens determines creditor recoveries under the Plan and is key assumption upon which the Disclosure Statement's projections rest. *Hawaiian Telcom* is equally distinguishable. In *Hawaiian Telcom*, the court had already addressed certain lien perfection issues in an adversary proceeding prior to confirmation and, unlike here, the debtors had already conducted their own independent lien analysis confirming the secured parties held liens on substantially all assets. *In re Hawaiian Telcom Comm's, Inc.*, 430 B.R. 564, 574-75, n.38 (Bankr. D. Haw. 2009). Here, the Debtors' own investment banker has testified under oath that the Disclosure Statement's lien representations are false—35% of the Debtors' foreign subsidiary equity and all U.S. real property is excluded from the collateral package, yet the valuation was prepared as if the secured lenders held liens on substantially all assets.[4]  This is not a case where the Court can simply assume the scope of disputed liens are valid;

---

[4] At the interim DIP hearing, Mr. Banks testified that 35% of the Debtors' equity in their foreign subsidiaries and all of the Debtors' real property in the United States is excluded from the secured lenders' collateral package. *See*

the Disclosure Statement's foundational premise is contradicted by the Debtors' expert's own sworn testimony, and this Adversary Proceeding must be resolved before confirmation and approval of the Disclosure Statement to ensure adequate information and an accurate factual record.

39.    Barclays also seeks to distort section 506(a)'s application to this Adversary Proceeding, arguing that section 506(a) requires the issues of collateral valuation to be addressed in context of plan confirmation.  Mot. ¶ 25.  But Barclays omits the language of the statute particularly applicable to this Adversary Proceeding:  section 506(a) requires that the collateral valuation "shall be determined *in light of the purpose of the valuation* and of the proposed disposition or use of such property. . . ."  11 U.S.C. § 506(a)(1) (emphasis added).  The purpose of the request for a declaratory judgment regarding the value of the collateral is to inform the parties of their respective positions and to dispel the lien scope and valuation fallacies in these cases, both essential precursors to plan confirmation and plan voting.

40.    The Secured Ad Hoc Group suggests that plan voting having already occurred should preclude the Adversary Proceeding from moving forward.  SAHG Joinder ¶ 4.  In reality, their argument further highlights the urgency of the declaratory relief requested in the Complaint to address the demonstrably erroneous representations of the lien scope and collateral value in the Disclosure Statement.   The Court cannot approve the Disclosure Statement as containing "adequate information" under section 1125 when the foundational representations regarding lien

---

Final DIP Objection ¶¶ 96, 138.  Critically, the Disclosure Statement represents that the non-ABL secured lenders have a lien on "substantially all the assets," and the Debtors confirmed that the valuation numbers reflected in the Disclosure Statement were prepared on that basis—yet Mr. Banks's sworn testimony reveals this representation to be materially misleading.  When asked whether the Debtors excluded any unencumbered property from their valuation calculation, Mr. Banks candidly admitted:  "Look, working with the other advisors, we did not exclude any other property. No. We started with the enterprise value of the company."  Final DIP Objection ¶ 138.  This admission confirms that the Debtors have been overstating the extent of Barclays' liens and, correspondingly, understating the value available to unsecured noteholders.

extent—which is a central issue in this case and determines creditors' recoveries—are contradicted by the Debtors' own investment banker's sworn testimony. *Supra* n.4. This adversary proceeding is the vehicle to determine the extent of the liens and the value of the collateral, and that determination is essential to assessing whether the Disclosure Statement's recovery projections—and creditors' votes based thereon—were premised on accurate information. *See In re Reilly*, 71 B.R. 132, 135 (Bankr. D. Mont. 1987) (denying approval of disclosure statement where it "lack[ed] adequate factual basis on valuation" and holding that an "adversary proceeding under Bankruptcy Rule 7001 must be filed to determine the validity, priority or extent of a lien or other interest in the property"). To permit confirmation to proceed without resolving this threshold question would be to confirm a plan on a false premise. *See id.* (stating "[i]t is not the purpose of a Chapter 11 Plan to be used as a litigating tactic" where an "adversary proceeding under Bankruptcy Rule 7001 must be filed to determine the validity, priority or extent of a lien or other interest in the property"). Moreover, the Secured Ad Hoc Group's argument that because the votes are in plan confirmation is a bygone conclusion is completely tone deaf. SAHG Joinder ¶ 5. Sufficient creditor votes cannot cleanse an unlawful plan nor can they expand the scope of prepetition liens.

41.     For the foregoing reasons, the Adversary Proceeding is far from a waste of judicial resources, it is an appropriate and necessary use of an adversary proceeding to resolve a central dispute in these cases. The evidence already in the record demonstrates that the collateral is far less extensive than advertised.

**B.      The Cross-Holder Ad Hoc Group Will Be Prejudiced By A Stay**

42.     Contrary to Barclays' and Arawak's assertions, the Cross-Holder Ad Hoc Group will suffer prejudice from a stay. The confirmation hearing is scheduled for no earlier than March 31, 2026. Dkt. No. 378. As explained in detail above, declaratory judgments with respect to the lien and collateral issues are essential gating items that must occur before confirmation. But, to

be clear, if this Adversary Proceeding is stayed until after confirmation, plan confirmation cannot determine the issues Bankruptcy Rule 7001 mandates to be litigated in an Adversary Proceeding— i.e., the "validity, priority, or extent" of Barclays' liens. *See In re Mansaray-Ruffin*, 530 F.3d at 238 (holding that confirmed plan provision could not alter the validity, priority or extent of a lien and that such determinations could only be made in an adversary proceeding as required under Bankruptcy Rule 7001); *In re Kressler*, 252 B.R. at 635 (sustaining objection to plan confirmation where debtor attempted to avoid lien through plan process, holding that "the Rules require a proceeding to determine the extent, validity or priority of a lien be instituted by complaint") (citing Fed. R. Bankr. P. 7001(b)); *In re Commercial W. Fin. Corp.*, 761 F.2d at 1338-39 (reversing confirmation due to trustee's "improper attempt to circumvent the bankruptcy rules of procedure" by seeking to avoid security interests through plan confirmation rather than initiating adversary proceedings under Bankruptcy Rule 7001); *In re Reilly*, 71 B.R. at 135 ("An adversary proceeding under Bankruptcy Rule 7001 must be filed to determine the validity, priority or extent of a lien or other interest in the property. It is not the purpose of a Chapter 11 Plan to be used as a litigating tactic"). The Cross-Holder Ad Hoc Group will preserve all their rights for appeal with respect to these issues and any attempt by the Debtors or Secured Lenders to determine these issues in the context of plan confirmation will be vigorously opposed and, if necessary, appealed. As the record indicates, the Sponsor and Secured Lenders have relied on speed and brute force in these chapter 11 cases. The Adversary Proceeding is an essential check on their attempted land grab.

43.     Moreover, as the Supreme Court recognized in *Kaiser Gypsum*, "broad participation promotes a fair and equitable reorganization process." 602 U.S. at 269 (citing *Bank of America Nat. Trust and Sav. Assn. v. 203 North LaSalle Street Partnership*, 526 U.S. 434, 444 (1999)). The Court noted that § 1109(b) addresses the concern that "a few insiders, whether

22

representatives of management or major creditors, [could] use the reorganization process to gain an unfair advantage." *Id.* at 280 (internal quotations omitted). Allowing the Cross-Holder Ad Hoc Group to be heard on these issues serves the fundamental bankruptcy policy of inclusion.

### C.      The Mediation Does Not Moot the Need for Judicial Resolution

44.     Barclays points to the Court-ordered mediation, which is scheduled to terminate no later than March 17, 2026, as further justification for a stay. Mot. ¶ 5. However, mediation is a voluntary process, and there is no guarantee that it will result in a consensual resolution of the disputed issues. This Adversary Proceeding should proceed in parallel with mediation to ensure that the Cross-Holder Ad Hoc Group has a meaningful judicial remedy if mediation is unsuccessful. Moreover, allowing the Adversary Proceeding to continue will better inform the parties on their respective positions and incentivize the parties to more earnestly seek a resolution through the mediation. *In re Roman Cath. Archbishop of San Francisco*, No. 23-30564-DM, 2025 WL 1087955, at *3 (Bankr. N.D. Cal. Apr. 10, 2025) (allowing cases to proceed in tandem with bankruptcy court-ordered mediation and noting "the actual conflicts between such parallel actions are more imagined than real"). Without the pressure of the Adversary Proceeding, mediation risks being a costly and, ultimately, ineffective exercise.

45.     By Barclays' logic, Mot. ¶ 28, the chapter 11 cases in their entirety should be put on hold given all substantive issues (*e.g.*, the Plan, Disclosure Statement, and DIP Motion) fall within the "Mediation Topics" defined in the Mediation Order. *See* Main Case, Dkt. No. 330, ¶ 5. Notwithstanding this broad scope, the Secured Lenders have continued to prosecute their interests in these chapter 11 cases with no mention that judicial economy demands they exclusively advocate such interests in mediation.

### III.    ABSTENTION IS NOT APPROPRIATE

46.    Barclays' and the Secured Lenders' requests for permissive abstention under 28 U.S.C. § 1334(c)(1) are equally without merit.  Barclays argues that abstention is appropriate in the interest of judicial economy.  Mot. ¶¶ 23-31.  However, Bankruptcy Rule 7001(b) requires an adversary proceeding to determine the validity, extent, and priority of liens; there is no alternative procedural device through which these issues could be adjudicated.  Fed. R. Bankr. P. 7001(b); *see supra* ¶¶ 35-36; 40. Abstention would not serve the efficient administration of the estates; it would simply defer necessary determinations without any corresponding benefit.

47.    Abstention would also not channel the lien and collateral issues in the Complaint into confirmation, as Barclays suggests.  Mot. ¶¶ 25-28.  Rather, it would deprive the Cross-Holder Ad Hoc Group of any meaningful opportunity to litigate these issues with the benefit of full discovery and a developed evidentiary record.  The multi-factor test for permissive abstention adopted by courts in this district favors proceeding with this Adversary Proceeding, not deferring it.

48.    The twelve factor test focuses on:

(1) the effect or lack thereof on the efficient administration of the estate if a court recommends abstention;

(2) the extent to which state law issues predominate over bankruptcy issues;

(3) the difficulty or unsettled nature of the applicable state law;

(4) the presence of a related proceeding commenced in state court or other non-bankruptcy court;

(5) the jurisdictional basis, if any, other than 28 U.S.C. § 1334;

(6) the degree of relatedness or remoteness of the proceeding to the main bankruptcy case;

(7) the substance rather than form of an asserted "core" proceeding;

24

(8) the feasibility of severing state law claims from core bankruptcy matters to allow judgments to be entered in state court with enforcement left to the bankruptcy court;

(9) the burden of [the court's] docket;

(10) the likelihood that the commencement of the proceeding in a bankruptcy court involves forum shopping by one of the parties;

(11) the existence of a right to a jury trial; and

(12) the presence in the proceeding of non-debtor parties.

*In re Vanhook*, 468 B.R. 694, 701 (Bankr. D.N.J. 2012).  "The result is a balancing test in which each of the relevant factors is weighed and analyzed on a case-by-case base, since not all of the factors may be relevant or present in a given case." *Id.*  "The factors should be applied flexibly, for their relevance and importance will vary with the particular circumstances of each case, and no one factor is necessarily determinative." *Id.* (internal quotations omitted).

49.    Here, all the factors (other than one irrelevant factor) weigh against abstention. ***Factor one***: Abstention would thwart judicial economy and the orderly administration of the estate given the declaratory relief sought under Bankruptcy Rule 7001 is required to be pursued via an adversary proceeding.  *See supra* ¶¶ 35-36, 40.  Given such issues are closely related to the declaratory relief sought pursuant to section 506(a), judicial economy would be best served by allowing both issues to proceed in the Adversary Proceeding, the only proceeding in which both issues can, in fact, proceed together.  As such, factor one weighs against abstention.

50.    ***Factors two and three***:  While state law dictates property interests and interpretation of debt agreements in bankruptcy, the extent of Barclays' liens and the value of the collateral are critical gating items that must be decided prior to confirmation.  The applicable law to determine the extent of Barclays' liens and value of their collateral is straightforward and well-settled.  In fact, the Debtor's investment banker, Mr. Banks, admitted at the First Day Hearing that

the debt documents do not provide the Secured Lenders with a blanket lien over all the Debtors' assets.  *Supra* n.4.  As such, factors two and three weigh against abstention.

51.     ***Factors four and five***:  there is no related proceeding pending in a state court or other non-bankruptcy court and the Adversary Proceeding is squarely within the jurisdiction of this Court under 28 U.S.C. § 1334(b).  These factors also weigh against abstention.

52.     ***Factors six, seven, and eight***:  As Barclays and the Secured Lenders admit, the issues presented in the Complaint are central to the proceedings in the main bankruptcy case.  Mot. ¶¶ 25-28; Arawak Joinder ¶¶ 7-13; SAHG Joinder ¶¶ 6, 8.  Indeed, the substance of the declaratory relief sought by the Cross-Holder Ad Hoc Group explicitly qualifies as a core proceeding under 28 U.S.C. § 157(b)(2)(K).  *Id.* ("Core proceedings include, but are not limited to . . . determinations of the validity, extent, or priority of liens.").  As such, the relief sought in the Complaint cannot be severed for prosecution in state court.  Accordingly, factors six, seven, and eight weigh against abstention.

53.     ***Factor nine***:  As explained above, allowing the Adversary Proceeding to proceed will streamline the determination of critical gating issues to plan confirmation.  And, the Adversary Proceeding is the only proceeding in which both forms of closely related declaratory relief can be litigated, thus reducing the burden on the Court of having to bifurcate the Bankruptcy Rule 7001 relief, which can only be prosecuted in an adversary proceeding, from the section 506 relief.  *See supra* ¶¶ 35-36, 40.  Factor nine also weighs against abstention.

54.     ***Factor ten***:  The commencement of the Adversary Proceeding in this Court certainly does not reflect forum shopping by the Cross-Holder Ad Hoc Group.  As this Court is aware, the Cross-Holder Ad Hoc Group maintains its objection that venue is improper in this Court

for the reasons set forth in its *Motion to Dismiss or, in the Alternative, Transfer the Chapter 11 Cases* [Main Case, Dkt. No. 71].  Factor ten weighs against abstention.

55.     ***Factor eleven*** is not relevant to the Adversary Proceeding or the Main Case.

56.     ***Factor twelve***:  While the parties to the Adversary Proceeding are all non-debtors, Barclays and the Secured Lenders concede the issues are critical to the administration of these chapter 11 cases.  *Supra* ¶ 51.  Indeed, the issues constitute a core proceeding and the Cross-Holder Ad Hoc Group have statutory and procedural rights under the Bankruptcy Code and Bankruptcy Rules to seek the declaratory relief in the Complaint.  Thus, factor twelve also weights against abstention.

57.     All factors (other than factor eleven, which is not relevant here) militate against Barclay's and the Secured Lenders' request for abstention.   Judicial economy, orderly administration of the estate, and overall fairness are better served by allowing the Adversary Proceeding to continue.

## CONCLUSION

58.     For the foregoing reasons, the Cross-Holder Ad Hoc Group respectfully requests that the Court deny Barclays' Motion to Dismiss and the Secured Lenders' respective Joinders in their entirety.  The Cross-Holder Ad Hoc Group has clear standing under 11 U.S.C. §§ 502 and 506 to seek declaratory relief concerning the scope and value of Barclays' liens.  The Cross-Holder Ad Hoc Group timely filed its challenge within the Challenge Period established by the Interim DIP Order.  Staying or dismissing this Adversary Proceeding would deprive the Cross-Holder Ad Hoc Group of its statutory and procedural rights and undermine the inclusive process that the Bankruptcy Code is designed to promote.

Dated:  March 13, 2026

**WOLLMUTH MAHER & DEUTSCH LLP**

*/s/  Paul R. DeFilippo*
Paul R. DeFilippo
James N. Lawlor
Joseph F. Pacelli (admitted *pro hac vice*)
500 Fifth Avenue
New York, New York 10110
Telephone: (212) 382-3300
Facsimile: (212) 382-0050
pdefilippo@wmd-law.com
jlawlor@wmd-law.com
jpacelli@wmd-law.com

**JONES DAY**

Bruce Bennett (admitted *pro hac vice*)
555 South Flower Street, Fiftieth Floor
Los Angeles, California 90071
Telephone: (213) 243-2382
Facsimile: (213) 243-2539
bbennett@jonesday.com

-and-

Benjamin Rosenblum (admitted *pro hac vice*)
Genna L. Ghaul
Andrew Butler (admitted *pro hac vice*)
Benjamin C. Sandberg (admitted *pro hac vice*)
250 Vesey Street
New York, New York 10281
Telephone: (212) 326-8312
Facsimile: (212) 755-7306
brosenblum@jonesday.com
gghaul@jonesday.com
abutler@jonesday.com
bsandberg@jonesday.com

*Counsel for the Cross-Holder Ad Hoc Group*

28